[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-14058

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ISAC SCHWARZBAUM,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:18-cv-81147-BB

_____

Before JORDAN, LAGOA, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Appellee's petition for panel rehearing is GRANTED. We VACATE our prior opinion in this case and substitute the following in its place:

Isac Schwarzbaum is a wealthy naturalized citizen of the United States. He was born in Germany and holds significant wealth in numerous bank accounts in Switzerland and Costa Rica. The U.S. tax regime required Schwarzbaum to report any foreign bank accounts to the Internal Revenue Service (the "IRS") using a form known as the FBAR. Although Schwarzbaum had read the FBAR filing instructions and engaged accountants to assist with his filings, he failed to report his foreign bank accounts to the IRS for years 2007–2009.

After a bench trial, the district court found that Schwarzbaum violated the FBAR statutes recklessly, thus satisfying the statutes' "willful" requirement for a higher penalty. The district court also found that the IRS had violated the FBAR statute in calculating the penalty because the IRS had used the wrong base numbers in calculating the statutory maximum. Rather than remanding to the IRS, however, the district court set aside the penalty and performed its own penalty calculation.

This is the second time this matter has been before our Court. In *United States v. Schwarzbaum*, 24 F.4th 1355 (11th Cir. 2022) ("*Schwarzbaum I*"), a panel of our Court upheld the district court's finding that Schwarzbaum's reckless failure to file FBAR reports satisfied the statute's "willfulness" requirement. The panel

also held that the district court had erred by performing its own calculation of the penalty and, therefore, vacated the district court's judgment and remanded with instructions to remand further to the IRS for a correct penalty calculation.

The IRS recalculated the penalty, reaching a higher -- and, this time, correct -- penalty, and the Government again moved for enforcement in the district court. At the Government's request, the district court retained jurisdiction over the case following its remand to the IRS and entered the same penalty as it had before remand. Schwarzbaum again appealed to this Court.

This case presents essentially two categories of questions. The first set are procedural questions asking whether the district court can enforce the IRS's recalculated penalties. These questions are easily answered: (1) the United States, as plaintiff in a civil case, has the discretion to seek a lower penalty amount than the IRS assessed; (2) the Eleventh Circuit in *Schwarzbaum I* already disposed of and rejected Schwarzbaum's statute-of-limitations argument; and (3) the district court did not err by retaining jurisdiction during a remand to the IRS that was, in essence, an interlocutory order.

More difficult is the fundamental question of whether FBAR penalties are fines within the meaning of the Eighth Amendment's Excessive Fines Clause. This is a matter of first impression for this Court. The only other circuit court to have addressed the question, the First Circuit, recently held that the Eighth Amendment's Excessive Fines Clause does not apply to FBAR penalties.

After careful consideration of the historical development of the Excessive Fines Clause and the FBAR's text, structure, and history, we decline to follow the First Circuit. Rather, we hold that FBAR penalties are in substantial measure punitive in nature. Therefore, under controlling Supreme Court precedent, they are subject to review under the Eighth Amendment's Excessive Fines Clause. And in this case, examining the penalties assessed against Schwarzbaum account by account as we must, we identify $100,000 in penalties levied against one account in each of the years 2007–2009, for a total of $300,000, that are grossly disproportionate to the offense of concealing that account, and are therefore in violation of the Excessive Fines Clause. We also hold, however, that the other penalties levied against the remaining accounts did not violate the Excessive Fines Clause because the penalties assessed against them were not grossly disproportionate to Schwarzbaum's willful concealment of tens of millions of dollars in overseas accounts.

We therefore strike the $300,000 in assessed penalties from the judgment, uphold the remaining penalties, and remand this case to the district court for the entry of a judgment in the amount of $12,255,813, plus the calculation of late fees and interest.

I.

A.

The Bank Secrecy Act of 1970 required, among other things, the Secretary of the Treasury to promulgate regulations requiring United States citizens to report any "transaction" or "relation" with

a "foreign financial agency." 31 U.S.C. § 5314(a). Consequently, the Secretary of the Treasury created the Report of Foreign Bank and Financial Accounts form, known as the FBAR. *See* 31 C.F.R. § 1010.350. Each American citizen with interests in or authority over any foreign bank account with a balance exceeding $10,000 must file an annual FBAR with the IRS identifying and describing that account. *See id.* §§ 1010.306(c), 1010.350(a).

The IRS has been delegated the authority to impose civil penalties on any person who violates the FBAR statute. *See* 31 U.S.C. § 5321(a)(5)(A) (granting penalty authority to the Secretary of the Treasury); 31 C.F.R. § 1010.810(g) (delegating to the IRS the authority to "assess and collect civil penalties under 31 U.S.C. [§] 5321"). Under the penalty statute adopted by Congress, the IRS "may assess a civil penalty . . . at any time before the end of the 6-year period beginning on the date of the transaction with respect to which the penalty is assessed." 31 U.S.C. § 5321(b)(1). For each tax year, covered persons must file their FBAR forms by June 30 of the following year. *See* 31 C.F.R. § 1010.306(c).

The maximum civil penalty for a willful violation of the FBAR reporting requirements is:

> [T]he greater of . . . $100,000, or . . . in the case of a violation involving a failure to report the existence of an account or any identifying information required to be provided with respect to an account, [fifty percent of] the balance in the account at the time of the violation.

31 U.S.C. § 5321(a)(5)(C)(i), (D)(ii).

## B.

Schwarzbaum was born in Germany in 1955. He has since lived in Germany, Spain, Costa Rica, Switzerland, and the United States, and he speaks English in addition to several other languages. Schwarzbaum became a legal permanent resident of the United States in 1995, and a United States citizen in 2000. From 1993 to 2010, he split his time between Costa Rica, Switzerland -- where his parents lived -- and the United States. In September 2010, Schwarzbaum moved to Switzerland and lived there full time until he returned to the United States in 2016.

Schwarzbaum's father was very successful in the textile and real estate industries in Germany, and Schwarzbaum's assets are derived from his father's gifts and bequests. In 2001, Schwarzbaum's father transferred an existing Swiss bank account into his son's name. Thereafter, Schwarzbaum's father continued to gift Schwarzbaum large sums of money until his death in 2009. After the death of Schwarzbaum's father, the money continued to be managed by bankers based upon the father's instructions, and Schwarzbaum never directed how the money should be invested or disagreed with any recommendations made by the bankers.

Between tax years 2006 and 2009, Schwarzbaum had an interest in eleven Swiss bank accounts and two Costa Rican bank accounts. The district court found that Schwarzbaum maintained these accounts because they were in places outside of the United States where he resided, not with the intention of evading United

States tax reporting requirements.  However, as an American citizen, Schwarzbaum was nevertheless plainly subject to the FBAR reporting requirements for these foreign bank accounts.  *See* 31 U.S.C. § 5314(a).

Schwarzbaum used certified public accountants ("CPAs") to prepare his tax returns in the United States.  Although Schwarzbaum disclosed his foreign accounts and gifts to his CPAs, he was advised (incorrectly) that he had no duty to report these assets because they were maintained outside of the United States.  Schwarzbaum's CPAs at various times filed incomplete FBARs or failed to file FBARs at all.

In 2008, however, Schwarzbaum opted to self-prepare and file an FBAR for the 2007 tax year.  On this FBAR, Schwarzbaum disclosed only a single Scotiabank account: the same one he had disclosed on his 2006 FBAR (which had been prepared by a CPA).  Schwarzbaum later testified that he had reviewed the instructions on the form to the best of his abilities.  Schwarzbaum did not file any FBAR for 2008 until December 2011.  For tax year 2009, Schwarzbaum again self-prepared an FBAR and disclosed a single Swiss account and two Scotiabank accounts, although he maintained many other undisclosed foreign bank accounts.

At some point in 2010, Schwarzbaum became aware that he was in violation of the FBAR requirements.  In 2010, Schwarzbaum disclosed his financial holdings through the IRS's Offshore Voluntary Disclosure Initiative (the "OVDI program"), including seventeen Swiss bank accounts and four Costa Rican bank accounts for

the years 2003 to 2010.  Ultimately, however, Schwarzbaum chose to opt out of the OVDI program, and his case was referred to the IRS for investigation.

Following the investigation, the IRS determined that Schwarzbaum willfully violated the FBAR reporting requirements for the 2006–2009 tax years.  Consistent with the statute, the penalty for each tax year for each unreported bank account was the greater of $100,000 or fifty percent of the account balance "at the time of the violation." 31 U.S.C. § 5321(a)(5)(C), (D)(ii).  The time of each FBAR violation was the reporting date: June 30 of the year after the tax year being reported.  *See* 31 C.F.R. § 1010.306(c).  However, in calculating the FBAR penalties, the IRS erroneously used the highest aggregate balance for each account for each year -- as was reported by Schwarzbaum on his OVDI worksheet -- instead of determining the balance in each account as of June 30 of each following year, as was required by the statute.  Using the wrong base numbers, the IRS arrived at an initial aggregate penalty in the amount of $35.4 million dollars.  The IRS determined that this number was excessive and mitigated the penalty by taking the penalties for the highest year and spreading the aggregate penalty for that year across all of the years, thus arriving at an aggregate penalty of $13,729,591.

Schwarzbaum appealed the IRS's proposed penalties to the IRS appeals office, which sustained and timely assessed the penalties in September 2016.  The assessments were timely despite the six-year statute of limitations because, in 2015, "the parties

executed a tolling agreement that extended the time period for the IRS to assess Schwarzbaum's penalties through December 2016." *Schwarzbaum I*, 24 F.4th at 1360 n.4.

### C.

Schwarzbaum failed to pay the penalties, and, in August 2018, the United States brought this action in the Southern District of Florida under 31 U.S.C. § 5321(b)(2) to collect them. *See Schwarzbaum I*, 24 F.4th at 1361. In March 2020, after conducting a five-day bench trial, the district court issued an opinion concluding that Schwarzbaum had willfully violated the FBAR reporting requirements in 2007, 2008, and again in 2009, but not in 2006. The district court found that Schwarzbaum did not knowingly violate the FBAR reporting requirements, but that he did so with "willful blindness" or "recklessness" because, after reading the FBAR instructions and self-preparing his own FBAR in 2007, he "was aware, or should have been aware, of a high probability of tax liability with respect to his unreported accounts."

The district court also concluded that the IRS miscalculated Schwarzbaum's FBAR penalties when it used the incorrect base amounts for each bank account and held that the penalties were therefore not consonant with the law under the Administrative Procedure Act ("APA"). Instead of remanding to the IRS, however, the district court then entered judgment for $12,907,952 based upon its own recalculation of the penalties. The district court also rejected Schwarzbaum's argument that the penalties were subject to review under the Eighth Amendment Excessive Fines Clause.

Subsequently, the Government filed a motion for an amended judgment of $12,555,813, which was the penalty amount the IRS had originally assessed against Schwarzbaum for tax years 2007 through 2009. The Government noted that it did not seek a judgment for more than the amount of the assessed penalties requested in its complaint. The district court granted the Government's motion and amended the final judgment accordingly.

On appeal, a panel of this Court affirmed both the finding of willfulness and the district court's conclusion that the penalties were not in accordance with the FBAR statute because the IRS had used the wrong base numbers in its calculation. *Schwarzbaum I*, 24 F.4th at 1358. However, the panel also found that "the district court further erred by calculating and imposing new penalties instead of remanding to the agency, as required by the APA." *Id*. We held that the IRS's error was not harmless because -- without presuming to guess what the IRS would do -- the possibility that the IRS may reach a lower result when recalculating penalties in accordance with the statute was enough to justify remand. *Id*. at 1366. Finally, the panel rejected Schwarzbaum's argument that remand to the IRS would be futile because the IRS would be time-barred on remand by the statute of limitations from recalculating his FBAR penalties. *Id*. at 1367. The Court observed that it was not aware of any authority standing for the proposition that "on remand from judicial review under the APA, an agency could be time-barred from re-evaluating its original actions." *Id*. The panel emphasized that "[t]he remand we now direct is not for the IRS to issue new penalties, but for it to recalculate the penalties it has

already assessed." *Id.* Because the panel directed a remand for re-calculation of the penalties, it did not reach Schwarzbaum's Excessive Fines Clause argument. *Id.* at 1358 n.1.

While awaiting the issuance of the mandate, the Government moved the district court to retain jurisdiction after remand to the IRS for recalculation of the penalties. The district court granted the motion over Schwarzbaum's objections and then remanded the penalties to the IRS for recalculation. The district court subsequently denied Schwarzbaum's Motion for Reconsideration of the Order Retaining Jurisdiction.

The IRS recalculated the penalties to correct the error in the original calculation and returned a corrected aggregate penalty in the amount of $13,521,328, approximately 7.7% higher than the original penalty. The Government then moved the district court to enter judgment against Schwarzbaum but asked that the district court forgo the difference in the revised penalty and limit judgment to the original penalty amount of $12,555,813 -- plus interest and failure-to-pay penalties -- asked for in the Government's complaint. The district court granted the Government's motion and entered judgment accordingly.

This timely appeal followed.

## II.

The most significant issue we face is Schwarzbaum's Eighth Amendment Excessive Fines Clause claim. Specifically, he says that the multi-million-dollar judgment sought by the Government

violates the Excessive Fines Clause. Accordingly, we address this argument first.

## A.

The question of whether FBAR penalties are "fines" falling within the meaning of the Eighth Amendment's Excessive Fines Clause is a matter of first impression in this Court. We review first the history of the Excessive Fines Clause and its interpretation in the federal courts. We then turn to the meaning of the FBAR penalty itself, as it relates to the Clause. We conclude that FBAR penalties are "fines" within the meaning of the Excessive Fines Clause.

### 1.

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

The history of the Excessive Fines Clause is well documented. "The text was taken, almost verbatim, from a provision of the Virginia Declaration of Rights of 1776, which in turn derived from the English Bill of Rights of 1689." *Ingraham v. Wright*, 430 U.S. 651, 664 (1977). The English Bill of Rights "was intended to curb the excesses of English judges under the reign of James II." *Id.* The Clause meant to address "excessive and partisan" fines levied by the King's judges against the King's enemies during the Stuarts' reign. *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 267 (1989) (citation omitted). These fines could be so steep that, by the 1680s, "some opponents of the King were forced to remain in prison because they could not pay the huge monetary

penalties that had been assessed.  The group which drew up the 1689 Bill of Rights had firsthand experience; several had been sub-jected to heavy fines by the King's bench."  *Id.* (citation omitted).

The English Bill of Rights' prohibition against excessive fines was itself the codification of a centuries-long English tradition pro-hibiting disproportionate fines.  *See Timbs v. Indiana*, 586 U.S. 146, 160 (2019) (Thomas, J., concurring).

> The Charter of Liberties of Henry I, issued in 1101, stated that "[i]f any of my barons or men shall have committed an offence he shall not give security to the extent of forfeiture of his money, as he did in the time of my father, or of my brother, but *according to the measure of the offence so shall he pay . . . .*"

*Id.* (quoting Sources of English Legal and Constitutional History 50 ¶ 8 (M. Evans & R. Jack eds. 1984)).  A little over 100 years later, the Magna Carta expanded on this principle by stating that:

> A free man shall be amerced for a small fault only ac-cording to the measure thereof, and for a great crime according to its magnitude, saving his position; and in like manner, a merchant saving his trade, and a villein saving his tillage, if they should fall under Our mercy.

*Id.* (quoting Magna Carta, ch. 20 (1215), in A. Howard, Magna Carta: Text & Commentary 42 (rev. ed. 1998)).  This tradition was very important.  "One historian posits that, due to the prevalence of amercements and their use in increasing the English treasury, '[v]ery likely there was no clause in Magna Carta more grateful to

the mass of the people than that about amercements.'" *Id.* at 161 (quoting Pleas of the Crown for the County of Gloucester xxxiv (F. Maitland ed. 1884)).

When the text from the English Bill of Rights was borrowed by the Founders, then, it reflected their pronounced fear of the "imposition of torture and other cruel punishments not only by judges acting beyond their lawful authority, but also by legislatures engaged in making the laws by which judicial authority would be measured." *Ingraham*, 430 U.S. at 665. By the time of the First Congress, "at least eight of the original States which ratified the Constitution had some equivalent of the Excessive Fines Clause in their respective Declarations of Rights or State Constitutions." *Browning-Ferris*, 492 U.S. at 264. Thus, because "the matter was not a likely source of controversy or extensive discussion," the Clause received little attention in the First Congress, and "Congress did not discuss what was meant by the term 'fines,' or whether the prohibition had any application in the civil context." *Id.* at 264–65.

### 2.

The outer limits of the Excessive Fines Clause developed slowly in our federal courts. The Supreme Court considered the Clause for the first time in *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257 (1989). *See Austin v. United States*, 509 U.S. 602, 606 (1993) ("We have had occasion to consider this Clause only once before." (referencing *Browning-Ferris*, 492 U.S. at 264)). In *Browning-Ferris*, the Supreme Court considered whether the Clause's ambit encompassed private civil actions and held that

the "Excessive Fines Clause does not apply to awards of punitive damages in cases between private parties." 492 U.S. at 260. In so holding, the Court emphasized that the "concerns in applying the Eighth Amendment have been with criminal process and with direct actions initiated by government to inflict punishment." *Id.* But the Court declined to hold that "the Excessive Fines Clause applies just to criminal cases." *Id.* at 263.

The question of whether the Excessive Fines Clause applies to civil cases was squarely presented to the Court, however, in *Austin v. United States*, 509 U.S. 602 (1993). There, the Court concluded that because the Excessive Fines Clause "limits the government's power to extract payments, whether in cash or in kind, 'as *punishment* for some offense,'" the question is not whether a given fine is "civil or criminal, but rather whether it is punishment." *Id.* at 609–10 (quoting *Browning-Ferris*, 492 U.S. at 265). Consequently, the Supreme Court held that, in order to escape the command of the Excessive Fines Clause, a penalty must "fairly be said solely to serve a remedial purpose." *Id.* at 610 (quoting *United States v. Halper*, 490 U.S. 435, 448 (1989)).[1] A penalty can be considered "remedial," the

---

[1]    *Halper* was a double jeopardy case. 490 U.S. at 436. It was subsequently abrogated by *Hudson v. United States*, 522 U.S. 93 (1997). Writing again in the double jeopardy context, the *Hudson* Court held that *Halper's* "'solely' remedial (*i.e.*, entirely nondeterrent)" test was too broad because "all civil penalties have some deterrent effect." *Id.* at 102. The Government argues that *Hudson* also abrogated the "solely remedial" test in *Austin*, which was quoting *Halper* but writing in the Eighth Amendment context. The district court accepted this argument. Although the district court acknowledged -- as it must

Court further held, if it "removes dangerous or illegal items from society" or serves to compensate the government for a loss or the costs of enforcing the law. *Id.* at 621. Notably, however, if the penalty in any way serves "either retributive or deterrent purposes, [it] is punishment," and thus subject to the Excessive Fines Clause. *Id.* at 610.

The Supreme Court expanded on this principle in *United States v. Bajakajian*, 524 U.S. 321 (1998). In *Bajakajian*, the respondent, upon leaving the United States, failed to report that he was carrying currency in excess of $10,000 to a customs inspector. *Id.* at 324–25. The Government then sought civil forfeiture of the entire $357,144 carried by the respondent. *Id.* at 325. The Supreme Court held this forfeiture was subject to the Excessive Fines Clause because the forfeiture of the unreported currency "serve[d] no

---

-- that "the FBAR penalty provision undoubtedly promotes deterrence," it nevertheless rejected application of the Eighth Amendment on the ground that the FBAR penalty had an "additional alternative" remedial purpose, and concluded that FBAR penalties are thus not subject to review under the Excessive Fines Clause. But this is where the district court erred: *Austin*'s "solely remedial" test remains good law in the Eighth Amendment context. *Hudson* itself stated, in abrogating *Halper*, that "some of the ills at which *Halper* was directed are addressed by other constitutional provisions," and then cited *Austin* as standing for the Eighth Amendment's protection against excessive civil fines. *Id.* at 102-03. Moreover, since *Hudson* was decided, the Supreme Court has reaffirmed the solely remedial test in the Eighth Amendment Excessive Fines context. *See United States v. Bajakajian*, 524 U.S. 321, 329 & n.4, 331 n.6 (1998); *Kokesh v. SEC*, 581 U.S. 455, 466–67 (2017). Therefore, binding precedent is clear that *Austin*'s solely remedial test remains good law in the Excessive Fines context, even if that test no longer applies in the double jeopardy context.

remedial purpose, [wa]s designed to punish the offender, and cannot be imposed upon innocent owners." *Id.* at 332. In so doing, the Court distinguished older cases where the monetary penalty was purely remedial in nature or where the forfeiture was purely *in rem* because of "the fiction that the action was directed against 'guilty property,' rather than against the offender himself." *Id.* at 330. The "early monetary forfeiture[]" cases, the Court reasoned, served "the remedial purpose of reimbursing the Government for the losses accruing from the evasion of customs duties," and were "thus no different in purpose and effect than the *in rem* forfeitures of the goods to whose value they were proportioned." *Id.* at 342–43.

In particular, the Court in *Bajakajian* distinguished its holding from its opinion in *One Lot Emerald Cut Stones & One Ring v. United States*, 409 U.S. 232 (1972) (per curiam). In *Emerald Cut Stones*, the Court, writing about Fifth Amendment double jeopardy, held that a tariff forfeiture provision was entirely remedial in nature, and thus non-punitive, because it "provide[d] a reasonable form of liquidated damages for violation of the inspection provisions and serve[d] to reimburse the Government for investigation and enforcement expenses." *Id.* at 237. Distinguishing *Emerald Cut Stones*, the Court in *Bajakajian* wrote that "[t]he additional fact that such a remedial forfeiture also 'serves to reimburse the Government for investigation and enforcement expenses,' is essentially meaningless, because even a clearly punitive criminal fine or forfeiture could be said in some measure to reimburse for criminal enforcement and investigation." *Bajakajian*, 524 U.S. at 343 n.19

(quoting *Emerald Cut Stones*, 409 U.S. at 237).  Instead, the Court explained that the critical question remained whether the penalty "is designed to punish the offender" and thus serves as "punishment even in part." *Id*. at 332, 331 n.6.  If so, the penalty is subject to the Eighth Amendment Excessive Fines Clause.  *Id*. at 331 n.6; *see also id*. at 329 n.4 ("We do not suggest that merely because the forfeiture of respondent's currency in this case would not serve a remedial purpose, other forfeitures may be classified as nonpunitive (and thus not 'fines') if they serve some remedial purpose as well as being punishment for an offense.  Even if the Government were correct in claiming that the forfeiture of respondent's currency is remedial in some way, the forfeiture would still be punitive in part. . . . This is sufficient to bring the forfeiture within the purview of the Excessive Fines Clause.").

Most recently, in *Kokesh v. SEC*, 581 U.S. 455 (2017), the Supreme Court said again, albeit in dicta, that a "modern statutory forfeiture is a 'fine' for Eighth Amendment purposes if it constitutes punishment even in part." *Id*. at 467 (quoting *Bajakajian*, 524 U.S. at 331 n.6).

### 3.

We turn, then, to the purpose of the FBAR penalty.  We begin, as we must, with the text of the statute itself.  *See Ross v. Blake*, 578 U.S. 632, 638 (2016).  This analysis leads us to the conclusion that the purpose of the FBAR penalty is -- at least in part -- punishment.

As we have said, the maximum penalty for a willful failure to report a foreign bank account is "[t]he greater of . . . $100,000" or fifty percent of "the balance in the account at the time of the violation." 31 U.S.C. § 5321(a)(5)(C)(i), (D)(ii). The Government argues that the purpose of this penalty is not to deter, but to remedy the Government's investigation and enforcement expenses associated with violations of the FBAR statute. But the text of the statute mandates that the penalty is calculated "irrespective of the magnitude of the financial injury to the United States, if any." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1308 (11th Cir. 2021). The Government can impose a $1,000,000 penalty on a $2,000,000 account regardless of whether the Government spent a million dollars investigating the case or whether it spent nothing at all, or any number in between. Indeed, in this very case, there's not the slightest indication from the Government how much time or money it expended in investigating each of Schwarzbaum's accounts. The Government has not made any argument that the investigation's expenditures amounted to the millions of dollars it seeks in penalties on some of the accounts. Instead, as we discuss later in detail, *see infra* Part II.B.2, the Government simply assessed a penalty on each account for the maximum amount permitted under the statute in every instance. We have previously explained in the context of applying the Excessive Fines Clause to civil forfeiture that "[w]here the value of forfeited property bears no relationship to the government's costs, an inquiry into whether the forfeiture is remedial is not necessary; it is almost certain that a portion of the

forfeited property will constitute punishment." *United States v. Dean*, 87 F.3d 1212, 1213 (11th Cir. 1996).

Additionally, the design of the statute itself makes clear that the severity of the penalty is tied directly to culpability. FBAR penalties are capped at $10,000 for a non-willful violation, 31 U.S.C. § 5321(a)(5)(B)(i), but increase to the greater of $100,000 or fifty percent of the account balance at the time of the violation for a willful violation, *id.* § 5321(a)(5)(C)(i). A willful violation of the FBAR statute thus has a ceiling limited only by the size of the violator's bank account, regardless of the corresponding tax liability or the time or cost spent by the Government remediating the problem.[2] Significantly, provisions that focus on the culpability of the defendant make a statutory penalty "look more like punishment, not less." *Austin*, 509 U.S. at 619.

Furthermore, as we've seen, the FBAR penalty for willful violations is steep. Because the penalty is imposed each year and can constitute fifty percent of the account balance on the date of the violation, FBAR penalties imposed for willful violations over a series of years could consume an account of any size in its entirety in

---

[2]     This potential punishment thus contrasts with the non-punitive tax penalties the Government describes as analogous. Although the Government states that the federal courts of appeals, following *Helvering v. Mitchell*, 303 U.S. 391 (1938), have "routinely held that even very substantial civil tax penalties -- such as the penalty for civil fraud" -- are not fines, the statutory maximum penalty for civil fraud is seventy-five percent of the tax not paid as a result of the fraud. 26 U.S.C. § 6663(a). In contrast, Schwarzbaum was assessed an FBAR penalty for 2007 equal to 3,264% of his tax deficiency.

just two years.[3]  We are aware of no comparable civil penalty in any other statute and none has been cited to us.  Moreover, we are not the first to find the FBAR penalty severe: The Taxpayer Advocate Service, an independent organization within the IRS itself, recently stated that "[t]he maximum FBAR penalty is among the harshest civil penalties the government may impose."  *Nat'l Taxpayer Advocate*, 2022 Purple Book 77 (Dec. 31, 2021), https://www.taxpayeradvocate.irs.gov/wp-content/uploads/2022/01/ARC21_PurpleBook_04_ReformPenInts_38.pdf.

We could stop there, but there is more.  If there were any remaining question about the punitive nature of the FBAR penalty after reading the statute itself, Congress has told us that the very design and purpose of the FBAR penalties is to deter.

When Congress adopted the Bank Secrecy Law in 1970, the penalties for willful violations could be imposed only on financial

---

[3]     The account would not be wiped out after two years, of course, if the IRS imposed a separate fifty percent penalty at the end of each applicable year, because then the account would only be halved, then halved again the next year, and still again in each year thereafter.  But when the IRS imposes multiple penalties at one time after a series of years -- as happened in this case -- the statute does not command the IRS to penalize the first year, reduce the account accordingly, and then penalize again.  Instead, the statute requires the IRS to calculate a fifty percent maximum penalty based on the June 30 balance for each year.  *See* 31 U.S.C. § 5321(a)(5)(C), (D)(ii); 31 C.F.R. § 1010.306(c).  So, if the account balance was $100,000 on June 30 of year one, and $100,000 again on June 30 of year two, then in year three the IRS could impose a $50,000 penalty for both year one and year two, for an aggregate penalty of $100,000, thus wiping out the account entirely.

institutions themselves and were capped at $1,000. *Bittner v. United States*, 598 U.S. 85, 98 (2023) (citing Pub. L. 91–508, § 125(a), 84 Stat. 1117); *The Drug Money Seizure Act and the Bank Secrecy Act Amendments: Hearing on S. 571 and S. 2306 Before the S. Comm. on Banking, Hous., & Urb. Affs.*, 99th Cong. 139 (1986) (hereinafter "*1986 Senate Hearing*") (response to written questions of Sen. Alfonse D'Amato from James Knapp and Brian Sun). In 1986, Congress expanded the penalties to apply directly to individuals on a per-account basis and raised the cap for willful reporting violations to the balance of the account at the time of the violation (not to exceed $100,000) or $25,000, whichever was greater. Pub. L. 99–570, § 1357(c), 100 Stat. 3207; *see also Bittner*, 598 U.S. at 98. Written testimony at the Senate hearing for the bill indicated that the new "penalty should improve compliance by individuals with the reporting requirement." *1986 Senate Hearing* at 123 (response to written questions of Sen. Alfonse D'Amato from Francis A. Keating).

But despite the Senate's confidence that this penalty would inspire greater compliance with the FBAR reporting requirements, compliance remained elusive. Indeed, in 2002, the Secretary of the Treasury reported to Congress that it was possible that fewer than twenty percent of United States citizens who were required to comply with the FBAR filing requirements actually did so. *See* Sec'y of the Treasury, *A Report to Congress in Accordance with §361(b) of the USA PARIOT Act* 6 (2002) ("It is difficult to determine with any accuracy how many taxpayers are failing to file required FBARs in any calendar year. . . . [T]he approximate rate of compliance with

the FBAR filing requirements based on this information could be less than 20 percent.").

Congress acted accordingly. In 2004, Congress adopted the current penalty scheme for willful violations: the penalty for a willful violation is $100,000 or fifty percent of the account balance at the time of the violation, for each account, whichever is greater. Pub. L. 108–357, § 821(a), 118 Stat. 1586. Citing to the Secretary of the Treasury's 2002 report, the Joint Committee on Taxation expressed concern with the lack of compliance with the "vitally important" FBAR reporting requirements. Staff of Joint Comm. on Tax'n, 108th Cong., *General Explanation of Tax Legislation Enacted in the 108th Congress*, pt. 17, § VII, 2005 WL 5783636, at *34 (Comm. Print 2005). Explaining the "reasons for change" to the FBAR penalties, the Committee wrote that "Congress believed that increasing the prior-law penalty for willful noncompliance with this requirement . . . will improve the reporting of foreign financial accounts." *Id.* That is, the purpose of the new penalties was to deter violations of the reporting requirement.

Indeed, until recently, the IRS itself appears to have considered the purpose of the FBAR penalty to be deterrence, not remedial in nature. At the time when the original penalties were imposed against Schwarzbaum, the Internal Revenue Manual -- which is publicly available on the IRS website -- stated that "[p]enalties should be determined to promote compliance with the FBAR reporting and recordkeeping requirements." IRM 4.26.16.6 (Nov.

6, 2015).[4]  Deterrence, in other words.  And the Supreme Court has been crystal clear that, at least for the purposes of the Eighth Amendment, deterrence is punitive in nature.  *Bajakajian*, 524 U.S. at 329; *see also Austin*, 509 U.S. at 620 (noting that legislative history characterizing a proposed forfeiture provision as a "powerful deterrent" "confirm[ed] the punitive nature of these provisions" (citation omitted)); *Tyler v. Hennepin County*, 598 U.S. 631, 649–50 (2023) (Gorsuch, J., concurring) ("Economic penalties imposed to deter willful noncompliance with the law are fines by any other name.  And the Constitution has something to say about them: They cannot be excessive.").

No matter how you cut it, it's apparent that this statute is designed to inflict punishment at least in part.  Whether we look at the text and structure of the statute -- which inflicts substantial penalties unconnected to the government's costs and expenses -- or at the deterrent reasons Congress has articulated for creating the penalty scheme, by every reasonable measure, the FBAR penalty has a powerful punitive purpose.  We hold, therefore, that the FBAR penalty is a fine subject to the Eighth Amendment's Excessive Fines Clause.

4.

One of our sister Circuits has already grappled with this question.  In *United States v. Toth*, 33 F.4th 1 (1st Cir. 2022), the First

---

[4]      This language was removed from the Manual in the revisions dated June 24, 2021.  See IRM 4.26.16.5. (June 24, 2021).

Circuit heard a similar case and concluded that FBAR penalties are not subject to the Eighth Amendment Excessive Fines Clause.  We remain unpersuaded.

In *Toth*, the First Circuit considered whether a $2 million penalty for willful failure to file an FBAR violated the Excessive Fines Clause.  *See id.* at 15.  The First Circuit looked to civil forfeiture under early customs laws and to civil tax penalties, which the Supreme Court held to be non-punitive for double jeopardy purposes in *Helvering v. Mitchell*, 303 U.S. 391 (1938).  *Toth*, 33 F.4th at 16–17.  The First Circuit reasoned that the FBAR penalty similarly reimbursed the United States for the generalized harm stemming from the concealment of money it is entitled to, including the difficulty for law enforcement to investigate these accounts, all of which can be far greater than the simple value of the money the Government was entitled to in the first place.  *Id.* at 17–18.

But *Helvering* is not binding in this case.  *Helvering* was a double jeopardy case applying a standard -- whether the penalty was "intended as punishment," 303 U.S. at 398–99 -- that is no longer applicable in the Excessive Fines context.  Following *Austin* and *Hudson v. United States*, 522 U.S. 93 (1997), the Supreme Court's double jeopardy jurisprudence regarding what constitutes "punishment" diverged sharply from its Excessive Fines jurisprudence:  although a penalty need not be "solely remedial" to escape the scope of the double jeopardy clause, this is not the case in the Excessive Fines context.  *Compare Hudson*, 522 U.S. at 102, *with Bajakajian*, 524 U.S. 321, 329 & n.4; *see also supra* note 1.  The issue with the First

Circuit's opinion in *Toth*, as we see it, is that it fails to circumnavigate the problem that even if the FBAR penalty has some remedial purpose, the test in the Excessive Fines context remains whether the purpose of the penalty is *solely* compensatory. For the reasons we have already explained, it is not. As Justice Gorsuch put it, dissenting from the denial of certiorari in *Toth*:

> This decision is difficult to reconcile with our precedents . . . . The government did not calculate [the FBAR] penalty with reference to any losses or expenses it had incurred. The government imposed its penalty to punish [the appellant] and, in that way, deter others. Even supposing, however, that [the appellant's] penalty bore both punitive and compensatory purposes, it would still merit constitutional review. Under our cases a fine that serves even *"in part* to punish" is subject to analysis under the Excessive Fines Clause.

*Toth v. United States*, 143 S. Ct. 552, 553 (2023) (Mem.) (Gorsuch, J., dissenting from denial of certiorari) (quoting *Austin*, 509 U.S. at 610).[5]

---

[5] The First Circuit's analysis in *Toth* is also distinguishable from ours because it is grounded on different circuit precedent. Much of the First Circuit's analysis focused on the circuit's own case, *McNichols v. Commissioner of Internal Revenue*, 13 F.3d 432 (1st Cir. 1993). *See Toth*, 33 F.4th at 18–19 ("Toth develops no argument as to why we should depart from *McNichols* on this score."). In *McNichols*, the First Circuit limited *Austin* to forfeitures under 21 U.S.C. §§ 881(a)(4) and (a)(7). *McNichols*, 13 F.3d at 434. Our Circuit has no such

We respectfully decline to "repeat [*Toth's*] mistakes." *Id.*

## B.

Having determined that the FBAR penalties fall within the scope of the Eighth Amendment, the second question we must answer is whether the FBAR penalties are excessive as applied to Schwarzbaum himself. It is not difficult to imagine hypothetical scenarios in which an FBAR penalty demanded by the IRS can be characterized clearly as a constitutional or unconstitutional sanction. "But the question whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context *de novo* review of that question is appropriate," *Bajakajian*, 524 U.S. at 336 n.10, because "analysis of Excessive Fines claims is a pure question of law," *United States v. 10380 SW 28th Street*, 214 F.3d 1291, 1293 (11th Cir. 2000) (per curiam). Schwarzbaum has not made any facial challenge on the FBAR penalty scheme as a whole -- we therefore have no occasion to question the constitutionality of a fifty percent fine on a theoretical account of any size triggering the FBAR statutory regime. The only question before us today is whether the fines imposed on Schwarzbaum's accounts are excessive as to Schwarzbaum. And so we engage in a careful investigation of the FBAR penalties assessed against Schwarzbaum's accounts, one by one.

---

precedent. To the contrary, we have read *Austin* as broadly applicable. *See, e.g.*, *Yates*, 21 F.4th at 1308 (applying *Austin* to non-intervened qui tam actions).

1.

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian*, 524 U.S. at 334. A fine will violate the Clause if it is "grossly disproportional to the gravity of a defendant's offense." *Id.* "Translating the gravity of a crime [or offense] into monetary terms -- such that it can be proportioned to the value of [a fine] -- is not a simple task." *United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1309 (11th Cir. 1999). Nevertheless, we have previously identified three non-exhaustive factors to consider when undertaking an Excessive Fines Clause analysis: "(i) whether the defendant is in the class of persons at whom the statute was principally directed; (ii) how the imposed penalties compare to other penalties authorized by the legislature; and (iii) the harm caused by the defendant." *Yates*, 21 F.4th at 1314 (citing *United States v. Chaplin's, Inc.*, 646 F.3d 846, 851 (11th Cir. 2011)).

At the outset, Schwarzbaum suggests that our excessive fines analysis should focus on the total aggregated fine. But this approach cannot be reconciled with the FBAR reporting regime. Rather, we must proceed carefully on an *account-by-account basis* precisely because the statutory regime characterizes *each* failure to report a bank account as a violation in and of itself. Section 5321 of Title 31 of the United States Code specifically authorizes penalties "in the case of a violation involving a failure to report the

existence of *an* account" -- not a single aggregated violation for the failure to submit an FBAR form reporting any number of accounts in a given year. *See also Bittner*, 598 U.S. at 94 (noting that § 5321 "does tailor penalties to accounts" in "cases that involve willful violations," such as this one, in contrast to cases that "involve only nonwillful violations").

Moreover, Schwarzbaum's preferred approach is inconsistent with how we have approached this issue in an analogous circumstance. There, our Court held that when penalties accrue on a violation-by-violation basis, courts should examine each penalty in proportion to each violation, rather than the cumulative total. *See Moustakis v. City of Fort Lauderdale*, 338 Fed. App'x 820, 822 (11th Cir. 2009) (per curiam) (analyzing the excessiveness of a $150-per-day fine for each day that a house was not in compliance with local codes, rather than the cumulative fine of $700,000 created by the failure to bring the house into compliance each day for fourteen years). Although we are not bound by *Moustakis*, we agree with its approach.

### 2.

Because the analysis must proceed on an account-by-account basis in each year, we begin by providing a chart summarizing the different accounts and the different penalties the Government seeks to impose on each of those accounts.

| Bank Account | Maximum Balance (Prior | June 30 Balance ($) | Maximum Statutory Penalty ($) |
|---|---|---|---|

| | Calendar Year) ($) | | |
|---|---|---|---|
| **2007** | | | |
| Aargauische | 15,809 | 11,872 | 100,00 |
| UBS 6308 | 1,988,799 | 8,615,602 | 4,307,801 |
| UBS 9250 | 15,022,514 | (5,571) | 100,000 |
| UMB | 672,185 | *Unknown* | 100,000 |
| Scotiabank de Costa Rica 0588 | *Unknown* | *Unknown* | 100,000 |
| **2008** | | | |
| Aargauische | 13,487 | 10,601 | 100,000 |
| Bank Linth | 2,605,399 | *Unknown* | 100,000 |
| BSI | 3,880,596 | *Unknown* | 100,000 |
| Clariden Leu | 3,712,704 | 4,106,132 | 2,053,066 |
| Raiffeisen | 3,101,437 | 3,137,728 | 1,568,864 |
| St. Galler | 3,353,964 | *Unknown* | 100,000 |
| UBS 6308 | 8,615,602 | *Closed* | 100,000 |
| UBS 9250 | 15,630,205 | *Closed* | 100,000 |
| UMB | 672,185 | *Unknown* | 100,000 |
| Scotiabank de Costa Rica 0588 | *Unknown* | *Unknown* | 100,000 |
| Scotiabank de Costa Rica 1472 | *Unknown* | *Unknown* | 100,000 |
| **2009** | | | |
| Aargauische | 15,758 | 9,966 | 100,000 |
| Banca Arner | 3,096,278 | 3,078,492 | 1,539,246 |
| Bank Linth | 2,955,271 | *Unknown* | 100,000 |

| BSI | 4,311,494 | *Unknown* | 100,000 |
| Clariden Leu | 4,374,222 | 4,504,702 | 2,252,351 |
| Raiffeisen | 3,139,508 | *Closed* | 100,000 |
| St. Galler | 4,267,212 | *Unknown* | 100,000 |

The penalty levied against the Aargauische account is constitutionally excessive in all three years at issue. Begin with the 2007 Aargauische account. The account never exceeded $16,000, and on June 30 -- the day the account was assessed -- the balance was only $11,872. However, under the statutory framework, the Government sought to impose a penalty of $100,000 for this undisclosed account. A $100,000 penalty for an account holding comparatively small amounts of currency strikes us as being "grossly disproportional to the gravity of the defendant's offense," *Bajakajian*, 524 U.S. at 337, namely, attempting to conceal from the IRS an account worth approximately $16,000 or less. A fine that is over eight times the amount in the account on the day of the assessment, and over six times the greatest amount ever held in the account, constitutes an excessive penalty.

Similarly, take the Aargauische account in 2008. Again, the account never exceeded $14,000, and when assessed on June 30, it contained $10,601. Again, however, Schwarzbaum was fined $100,000 for this account -- reflecting an amount over seven times as great as the maximum account balance, and over nine times the amount in the account on the assessment date. And again, just as with the 2007 Aargauische account, a penalty that is more than seven times as great as the maximum ever held in the account --

and nine times the amount held in the account on June 30 -- is "grossly disproportional" to Schwarzbaum's willful failure to disclose his foreign account containing less than $14,000.  *Id.*

Finally, an examination of Schwarzbaum's Aargauische account in 2009 reveals the same problem.  As in prior years, this account contained a small balance.  It never exceeded $16,000, and when assessed, it contained only $9,966.  Schwarzbaum was again fined $100,000 for this account, reflecting an amount more than six times the maximum amount in the account, and ten times the amount in the account on the assessment date.  Just as with the Aargauische account in prior years, this, too, is "grossly disproportional" to the culpability at issue -- attempting to conceal, at most, roughly $16,000 from the IRS.  *Id.*

The Government resists, asserting at oral argument that the $100,000 penalty for an account never holding more than $16,000 is not excessive "[b]ecause Congress specifically set these penalties for the maximum to be the greater of one hundred thousand [dollars] or fifty percent of the account balance," so this Court must "give[] substantial deference to Congress's determinations."  While it's true that we begin our analysis with a "strong presumption" that the penalties Congress has created are constitutional, *Chaplin's, Inc.*, 646 F.3d at 852, that presumption has its limits.  We cannot ignore the command of the Eighth Amendment's Excessive Fines Clause.  Here, the Aargauische account across three years reflects an attempt by the Government to collect a $100,000 fine for each of the three violations, each of which involved an account

never exceeding $16,000. Section 5321 of Title 31 of the United States Code dictates only the maximum penalty to be imposed on each account. Nothing forbade the Government from assessing a penalty proportionated to the nature and extent of the violation on the Aargauische account in each year. Instead, however, the Government sought the statutory maximum of $100,000 each time. There is little doubt in our mind that each of these penalties is grossly disproportionate, and therefore the $300,000 the Government seeks to fine Schwarzbaum for his Aargauische account is constitutionally excessive.

The penalties assessed on the remainder of the accounts, however, raise no proportionality problems.

We begin by looking at the eight bank accounts with an unknown balance on June 30 but with a known maximum balance: the UMB account in 2007, the Bank Linth, BSI, St. Galler, and UMB accounts in 2008, and the Bank Linth, BSI, and St. Galler accounts in 2009. The Government seeks to fine Schwarzbaum the default statutory maximum of $100,000 for his willful failure to disclose each of these accounts. For each of these accounts, the balance on June 30 is simply "unknown." However, this does not necessarily hamstring a proportionality analysis comparing the amount of currency in the account to the $100,000 penalty. Although the June 30 balance is used to calculate the penalty, 31 U.S.C. § 5321(a)(1)(5)(D)(ii), the duty to *report* the account is triggered not by the June 30 balance, but by the maximum amount in the account during the prior tax year, 31 C.F.R. § 1010.306(c). Thus, we

can infer that the harm Congress sought to ameliorate was not associated with the balance of the bank account on June 30, but rather the amount concealed in the account during the reported tax year.  As the maximum balance concealed in the bank account during the tax year increases, so does the gravity of failing to report that account to the IRS by June 30 of the following year.  The Supreme Court has instructed us that, when conducting a proportionality analysis for the Excessive Fines Clause, it is the gravity of the offense itself to which the fine must be proportional.  *Bajakajian*, 524 U.S. at 334.  Therefore, although the FBAR penalty is calculated based on the June 30 reporting date, the conduct it must be proportional to is the concealment of funds found in each bank account the previous year.

Here, an examination of these accounts yields the observation that the account with lowest maximum balance during the preceding year (UMB in both 2007 and 2008) held $672,185 in each year.  The $100,000 penalty assessed against that account is not "grossly disproportionate" to the offense of attempting to conceal nearly seven times the amount of the fine.  *See Bajakajian*, 524 U.S. at 337.  The maximum account balances only go up from there.  The next smallest bank account for which the June 30 balance is unknown but the maximum balance was known is Bank Linth in 2008, which held a maximum amount of $2,605,399 -- fully twenty-six times the penalty for concealing the account.  And at the high end of the "unknown" bank accounts, the BSI account in 2009 held a maximum of over $4.3 million -- forty-three times the penalty the Government seeks.  There is nothing disproportionate about a

$100,000 fine for the willful concealment of accounts of those magnitudes.

Moving onto the accounts which were open for some portion of the tax year but closed by the June 30 reporting date -- UBS 6308 and UBS 9250 in 2008, and Raiffeisen in 2009 -- the proportionality analyses yield the same conclusions for the same reasons. Again, although the balance in each of these accounts on June 30 was effectively $0 (because each of the accounts were closed), the duty to report was triggered by the maximum amount in each account the previous year. In 2008, UBS 6308 and UBS 9250 held at various points throughout the year $8,615,602 and $15,630,205, respectively. In other words, although each of these bank accounts were closed at the time of the June 30 reporting date, the $100,000 penalty sought by the Government for each of these accounts is more than proportional to the offense of concealing an amount 86 times and 156 times the amount of the fine, respectively. Similarly, in 2009, although the Raiffeisen bank account was closed on the reporting date, the $100,000 penalty sought by the Government is only about three percent of the $3,139,508 maximum value concealed in the account the previous year. These are simply not the types of penalties that run afoul of the Eighth Amendment Excessive Fines Clause.

The Government also seeks to impose a penalty of $100,000 for each of the Scotiabank accounts held by Schwarzbaum in 2007 and 2008. Both the maximum amount held in the accounts and the amounts held in each of these accounts on June 30 are listed as

being "unknown."  While it is theoretically possible to make an excessive fines argument concerning each of these accounts, because it is possible that the $100,000 fine for each account could be disproportionate, we do not know how much money was in either of these accounts at any time during calendar years 2007 and 2008.  It is Schwarzbaum's burden to establish that each of these penalties violates the Eighth Amendment Excessive Fines Clause.  *See Helling v. McKinney*, 509 U.S. 25, 35 (1993) (noting that a plaintiff must prove the "objective elements necessary to prove an Eighth Amendment violation").  In order for us to conduct a proportionality analysis, we would have to know more than we are told.  But Schwarzbaum has told us nothing about these accounts.  In fact, Schwarzbaum has not made any argument that the $100,000 penalties imposed by the Government on these accounts specifically are excessive and therefore violate the Eighth Amendment.  Since he has not claimed nor proven that the $100,000 penalties concerning the Scotiabank accounts specifically are excessive, the fines assessed against each of them survive.

The penalties assessed against the remaining six bank accounts -- UBS 6308 and UBS 9250 in 2007, Raiffeisen in 2008, Clariden Leu in 2008 and 2009, and Banca Arner in 2009 -- are also not disproportionate.  No doubt, the penalties imposed by the Government on five these of these bank accounts -- all but UBS 9250[6] --are

---

[6]    The sixth bank account, UBS 9250 in 2007, is different.  There, the Government assessed a $100,000 penalty even though the account balance on June 30 was negative $5,571.  Although penalizing a negative account may

substantially larger than the $100,000 penalties we have discussed up until this point: here, the Government assessed a penalty against each of these accounts equal to fifty percent of the account balance on June 30. But each of these bank accounts also held millions of dollars – in some instances, many millions of dollars – that Schwarzbaum willfully failed to disclose to the United States.

We begin our consideration of these penalties with the "strong presumption" that the penalties Congress has created are constitutional. *Chaplin's, Inc.*, 646 F.3d at 852. "[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature," *Bajakajian*, 524 U.S. at 336, because "Congress, as a representative body, can distill the monetary value society places on harmful conduct," *Chaplin's, Inc.*, 646 F.3d at 852.

We also note at the outset that Congress's decision to create a penalty that is proportionally tied to the amount in the account is not irrational -- indeed, the principle that greater harm yields a greater penalty is reflected throughout our legal system. *See, e.g.*, U.S. Sent'g Guidelines Manual § 2B1.1 (U.S. Sent'g Comm'n 2023) (increasing the guideline offense level for larceny, embezzlement, theft, fraud, property damage, and forgery based upon the monetary value of the loss involved); 21 U.S.C. § 841(b)(1) (proportioning the statutory penalty for controlled substance distribution to the amount distributed). The very fact that Congress based the

---

seem odd at first blush, the account held over $15 million in the prior year. A $100,000 penalty is not grossly disproportionate to the willful failure to disclose more than 150 times that amount.

willful FBAR penalty on the account balance and not the tax loss reflects the judgment that, like fraud or theft, the harm Congress seeks to ameliorate increases with the size of the amount hidden from the Government.

Furthermore, Congress's choice to tie the size of the penalty to the size of the account is particularly rational where, as here, a fundamental purpose of the penalty is deterrence. As we have frequently observed, "[g]eneral deterrence is more apt, not less apt, in white collar crime cases," because "'economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity,' which makes them 'prime candidates for general deterrence.'" *United States v. Howard*, 28 F.4th 180, 209 (11th Cir. 2022) (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013)); *see also United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (agreeing with the "widely accepted principle" that white collar crimes are "prime candidates for general deterrence" (citation omitted)). Because white collar criminals "often calculate the financial gain and risk of loss . . . white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). Or, to put it the other way, if Congress had *not* tied the FBAR penalty to the amount in the account, defendants would be increasingly incentivized not to comply with the reporting requirements as the amounts in the concealed accounts (and thus the harm to the government) grew larger, because the advantage from concealing the account would increasingly outweigh the potential risk of loss when the account is discovered.

With these presumptions and principles in mind, we consider the factors that our Court has enumerated to determine excessiveness: "(i) whether the defendant is in the class of persons at whom the statute was principally directed; (ii) how the imposed penalties compare to other penalties authorized by the legislature; and (iii) the harm caused by the defendant" in this case. *Yates*, 21 F.4th at 1314. Going account by account, we are not persuaded that any of the remaining fines -- even those taking fifty percent of an account in a given year -- are excessive as applied to Schwarzbaum in this case.

First, there is no question the FBAR penalties are concerned with defendants precisely like Schwarzbaum. The purpose of the Bank Secrecy Act is to require "U.S. citizens and others to report their 'transaction[s]' and 'relationship[s]' with 'foreign financial agenc[ies]' to the IRS." *Schwarzbaum I*, 24 F.4th at 1359 (quoting 31 U.S.C. § 5314). "Schwarzbaum is a wealthy, naturalized U.S. citizen" who "held interests in foreign bank accounts in Switzerland and Costa Rica." *Id.* Schwarzbaum is "not in the same position as the defendant in *Bajakajian*, who, by not reporting the removal of legal currency from the United States, was subject to forfeiture under a statute principally targeted at money launderers, drug traffickers, or tax evaders." *Yates*, 21 F.4th at 1315.

Moreover, Congress specifically reserved the severe penalties that Schwarzbaum is subject to only for those who "willfully" violated the statute. 31 U.S.C. § 5321(a)(5)(C). This Court already held that Schwarzbaum satisfied the "willful" *mens rea* in the civil

FBAR context through reckless conduct. *Schwarzbaum I*, 24 F.4th at 1358. And Congress has often determined that a *mens rea* of recklessness can subject an individual to criminal penalties, illustrating that a *mens rea* of recklessness is not unknown to the criminal law.[7]

---

[7]    We note in passing that the government is correct that the willfulness standard for criminal FBAR penalties found in 31 U.S.C. § 5322 is different from the willfulness standard for civil FBAR penalties found in 31 U.S.C. § 5321. *Compare United States v. Rum*, 995 F.3d 882, 889 (11th Cir. 2021) (holding that "willfulness in § 5321 includes reckless disregard of a known or obvious risk"), *with Ratzlaf v. United States*, 510 U.S. 135, 137 (1994) (requiring the government to "prove that the defendant acted with knowledge that his conduct was unlawful" to impose criminal penalties under § 5322). But the substantially increased civil FBAR penalties for willful (including reckless) conduct codified by Congress establish that Congress did not view a willful civil FBAR violation lightly. After all, the idea of penalizing recklessness straddles both the civil and criminal spheres where the underlying conduct is sufficiently serious. *See, e.g.*, *Voisine v. United States*, 579 U.S. 686, 688 (2016) (holding that reckless conduct triggers a statutory firearms ban, which carries criminal penalties if violated); *Counterman v. Colorado*, 600 U.S. 66, 69 (2023) (holding that a mental state of recklessness is sufficient to criminally convict an individual for communicating true threats of violence); *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964) (holding that an individual who recklessly disregards whether an utterance is false can be criminally charged for libel). From our research, there are at least 18 statutory provisions in the United States Code that expressly impose criminal penalties for reckless conduct. *See, e.g.*, 8 U.S.C. § 1324(a)(1)(A) (bringing in and harboring certain illegal aliens); 10 U.S.C. § 913 (operating a vehicle, aircraft, or vessel while intoxicated); 18 U.S.C. § 32(a)(5) (destroying aircraft or aircraft facilities); 18 U.S.C. § 33(a) (destroying motor vehicles or motor vehicle facilities); 18 U.S.C. § 922(q)(3)(A) (discharging a firearm in a school zone); 18 U.S.C. § 1365(a) (tampering with consumer products); 18 U.S.C. § 1589(b) (benefitting from forced labor); 18 U.S.C. § 1591(a)(2) (sex trafficking of children or by force); 18 U.S.C. § 1593A (benefitting financially

Therefore, Schwarzbaum is not an innocent victim: he is only subject to the fifty percent penalty because he recklessly disregarded the law which required him to report foreign bank accounts. Schwarzbaum's own willful blindness is what placed him "squarely in the [FBAR statute's] crosshairs." *Yates*, 21 F.4th at 1315.

Second, we compare the fines to other sanctions authorized by Congress. *Id.* Here, Congress authorized the Government to pursue criminal sanctions; the Government merely chose not to do so in this case. The FBAR statute's criminal penalties provide a fine of up to $250,000 and five years' imprisonment for each willful FBAR violation,[8] in addition to civil penalties. *See* 31 U.S.C. § 5322(a). Although the criminal fine pales in comparison to the civil penalty assessed for the five accounts for which the Government assessed a penalty of fifty percent of the balance, it is telling that Congress also authorized a criminal penalty of five years' imprisonment for each of the three years Schwarzbaum failed to file.

---

from peonage, slavery, or trafficking in persons); 18 U.S.C. § 1861 (deceiving prospective land purchasers); 18 U.S.C. § 1864(a)(3) (using hazardous or injurious devices on federal lands); 18 U.S.C. § 1992(a)(2)–(3) (placing destructive devices or hazardous materials in mass transportation systems); 18 U.S.C. § 2292(b) (imparting or conveying false information related to the destruction of a vessel or maritime shipping); 18 U.S.C. § 2421A(b)(2) (promoting or facilitating prostitution); 18 U.S.C. § 2424(a) (harboring an alien for the purpose of prostitution); 49 U.S.C. § 5124(a) (transporting or tampering with hazardous materials); 49 U.S.C. § 46505(c) (carrying a weapon or explosive on an aircraft); 49 U.S.C. § 46507(1) (making false threats concerning aircraft).

[8]    In the context of the FBAR's criminal statute, these penalties accrue on a per-report, not per-account basis. *Bittner*, 598 U.S. at 103.

*Id.* That Congress authorized "five years' imprisonment for willfully violating the statutory reporting requirement . . . suggests that it did not view the reporting offense as a trivial one." *Bajakajian*, 524 U.S. at 339 n.14.

Third, and finally, we consider the harm caused by the defendant. *Yates*, 21 F.4th at 1314. Congress considered the harm of unreported foreign bank accounts to be very serious. In passing the Bank Secrecy Act, Congress emphasized that the use of "[s]ecret foreign bank accounts" has

> permitted proliferation of 'white collar' crime; ha[s] served as the financial underpinning of organized criminal operations in the United States; have been utilized by Americans to evade income taxes, conceal assets illegally and purchase gold; have allowed Americans and others to avoid the law and regulations governing securities and exchanges; have served as essential ingredients in frauds including schemes to defraud the United States; have served as the ultimate depository of black market proceeds . . .; and have served as the cleansing agent for 'hot['] or illegally obtained monies.

H.R. Rep. No. 91-975, at 4397 (1970). Indeed, Congress stated that "[t]he debilitating effects of the use of these secret institutions on Americans and the American economy are vast." *Id.*

Congress reiterated these concerns when it raised the FBAR penalties in 2004, stating that "improving compliance with [the FBAR] reporting requirement is vitally important to sound tax

administration." S. Rep. No. 108-192, at 108 (2003). Even more recently, in March 2023, the Senate Finance Committee recommended that the IRS "increase oversight and enforcement of FBAR violations, focusing on violations by high-net worth individuals." *Credit Suisse's Role in U.S. Tax Evasion Schemes: A Democratic Staff Investigation* 37 (Mar. 29, 2023), https://www.finance.senate.gov/download/sfc-credit-suisse-report-final-32923.

Turning now to the five accounts where the Government assessed a fifty percent penalty, we see that in 2007, the UBS 6308 bank account held $8,615,602 on June 30, and the Government assessed a penalty of half that amount: $4,307,801. The Government also claimed half of the June 30 account balance for Clariden Leu and Raiffeisen in 2008 (penalties of $2,053,066 and $1,568,864, respectively) and Banca Arner and Clariden Leu in 2009 (penalties of $1,539,246 and $2,252,351, respectively).

The Government has thus assessed a substantial penalty as to each of these five accounts.[9] But, as we have said, we are not considering the constitutionality of *any* hypothetical fifty percent penalty applied year after year -- we have no trouble imagining situations where such a penalty would be clearly excessive. Rather, we consider only whether the penalties *here* are grossly disproportionate as applied to Schwarzbaum, looking at each penalty on each account in each year. And, for the reasons we described as we

---

[9]    Indeed, in the case of the Clariden Leu bank account, the fifty percent penalty assessed for each of the years 2008 and 2009 wiped out the four-million-dollar account entirely.

proceeded through the three factors our Court has enumerated for judging excessiveness, we cannot say that the fifty percent penalties are grossly disproportionate in this case to the serious offenses of willfully concealing foreign bank accounts containing many millions of dollars. Congress sought to deter precisely the harm for which Schwarzbaum is culpable, Congress considered that harm to be a very serious one, and Congress's method of deterring that harm is rational. Although the fifty percent penalties assessed against the five accounts are substantial, they are not violative of the Excessive Fines Clause.

Finally, even if we were to consider the aggregate penalty of $12,555,813 entered against Schwarzbaum -- notwithstanding that the statutory language focuses singularly on each "account" -- the aggregate penalty is not grossly disproportionate to Schwarzbaum's willful years-long concealment of tens of millions of dollars in many overseas bank accounts found in two separate countries. *See Yates*, 21 F.4th at 1314 ("[W]e address the parties' debate on whether we should consider the amount of the fine cumulatively or per-violation. Our answer is that in this case it does not matter. Seeing a judgment of $1.179 million based on $755.54 in actual damages may raise an eyebrow. But whatever optics inure to Pinellas' benefit by that comparison, they are negated when one realizes that this total is the result of Pinellas' repeated (214) instances of fraud against the United States."); *see also Moustakis*, 338 F. App'x at 822 (noting that when a cumulative fine is made up of constitutionally proportionate penalties, the cumulative fine "is, literally, directly proportionate to the offense"). Moreover, although the

penalty calculated against each account was the statutory maximum, the Government then lowered the cumulative total it seeks to fine Schwarzbaum.  The presumption of constitutionality is particularly strong when the specific penalty sought by the Government is less than the statutory maximum.  *See Yates*, 21 F.4th at 1314; *Chaplin's, Inc.*, 646 F.3d at 852.

3.

To sum up: The aggregated maximum statutory penalty is $13,521,328.  The only constitutional problem we can discern with that total penalty is that it included $300,000 in penalties associated with the Aargauische account in each of 2007, 2008, and 2009, which we hold violates the Excessive Fines Clause.  Had the district court's judgment been for the full $13,521,328, the solution would be simple: we would simply sever the unconstitutional amount from the total judgment, reduce the total judgment by $300,000, and remand to the district court for calculation of late fees and interest.

But there is a wrinkle.  On a motion from the Government, the district court reduced the penalty and entered judgment against Schwarzbaum for $12,555,813.   While the unconstitutional $300,000 from the Aargauische account is clearly a portion of the total $13,521,328, it's impossible to decipher to what extent, if any, that $300,000 is included in the lesser judgment of $12,555,813, because neither the district court nor the Government offered any guidance on how the various individual penalties were reduced to reach the new aggregate number.  In other words, without greater

guidance from the Government, we are unable to reduce the sum of $12,555,813 into its component parts, locate the portion of this judgment, if any, reflecting the fines assessed on the Aargauische account, and appropriately excise this amount from the final judgment. Therefore, to sanitize the final judgment from any constitutional violation, we order the district court to reduce the judgment of $12,555,813 by $300,000.[10]

---

[10]    The government suggests that the usual remedy for an excessive fine is reduction to a non-excessive amount or remand to the district court for consideration of an appropriate amount. Under the circumstances of this case, however, the government's preferred approach makes little sense to us. For one thing, Schwarzbaum's case has been pending for more than six years and has already gone through one prior round of appellate review and remand to the district court. Moreover, the balance in the relevant Aargauische account never exceeded $16,000 between the years 2007 to 2009. With an account balance so small, there is little reason to reduce the three excessive fines to non-zero amounts, especially considering that the aggregate penalty already exceeds $12 million. Finally, the government has provided us with no guidance (e.g., relevant numbers or suggested calculations) to arrive at an appropriate non-excessive penalty amount. Thus, in this case, we use our broad equitable discretion to fashion the remedy of striking the three excessive $100,000 fines in their entirety. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a [] court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *Azar v. Garza*, 584 U.S. 726, 729 (2018) (per curiam) (noting that an appellate court's equitable practices turn on "the conditions and circumstances of the particular case" (citation omitted)).

We therefore remand for the district court to enter a judgment in the amount of $12,255,813, plus the calculation of late fees and interest.

III.

Finally, we briefly address Schwarzbaum's remaining procedural challenges.  We review a district court's decisions on agency action under the APA *de novo*.  *Schwarzbaum I*, 24 F.4th at 1363.  If necessary, the underlying agency action is reviewed under the standards set forth in the APA, whereby the reviewing court shall "'hold unlawful and set aside agency action' that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Id*. at 1363–64 (quoting 5 U.S.C. § 706(2)(A)).  And, of course, following a bench trial, we review the district court's conclusions of law *de novo,* but its factual findings only for clear error.  *Crystal Ent. & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1319 (11th Cir. 2011).

A.

Schwarzbaum first suggests that the district court erred by awarding penalty amounts in the judgment identical to those rejected by the district court and the Eleventh Circuit.  Schwarzbaum argues that the Eleventh Circuit already held that those penalty assessments were "arbitrary and capricious" in *Schwarzbaum I* because they were unconnected to his account balances as of the June 30 reporting date for each tax year.  Because the district court's judgment enforced a penalty for the same amount, the reasoning goes, these penalties "are no less arbitrary and capricious this time

around" and should be vacated because they are not based on the IRS's new calculations.

But Schwarzbaum has misunderstood our Court's holding in *Schwarzbaum I*. In *Schwarzbaum I*, the panel at no point said that the original penalty calculations by the IRS were arbitrary or capricious. Instead, we held that the IRS's original FBAR penalty calculations were "not in accordance with law" precisely because "the IRS mistakenly calculated Schwarzbaum's statutory maximum penalties using his foreign accounts' highest annual balances rather than their June 30 balances." *Schwarzbaum I*, 24 F.4th at 1365. The Eleventh Circuit remanded the case to the IRS "in order to allow the IRS to fix the mistake." *Id.*

Schwarzbaum's argument misidentifies the fundamental harm in the IRS's original calculation. This Court rejected the Government's argument that the IRS's calculation error was harmless because Schwarzbaum was *potentially* prejudiced. At the time of *Schwarzbaum I*, no one knew whether the penalty calculated by the IRS was too high because the base numbers were wrong. *Id.* at 1366. Because the panel could not presume to guess what the IRS might do on remand, the fact that the IRS might reach a different, lower penalty amount was sufficient reason to remand the calculation to the agency. *Id.*

Contrary to Schwarzbaum's argument that "[t]o hold that the previously rejected amount is now acceptable would expressly conflict with this Court's prior ruling that the defective penalty assessments were not harmless error," the prejudice to

Schwarzbaum that we expressed concern about in *Schwarzbaum I* is no longer present. The IRS recalculated the penalties to correct the error in the original calculus and returned a corrected penalty of $13,521,328, approximately 7.7% higher than the original penalty. Neither party disputes at this stage that the IRS's new calculations are correct. Since we now know for certain the "correct" penalty amount, which is higher than the amount originally enforced, there is no potential that Schwarzbaum is being penalized for too high an amount.

Schwarzbaum also argues that the prejudice he faces is that, were the Government forced to file an amended complaint to seek the full penalty as recalculated by the IRS, the Government would have to "defend[] a new assessment of a properly calculated penalty it knows is time-barred." However, this argument is meritless for two reasons: (1) Schwarzbaum is already making the exact same statute-of-limitations argument before this Court at present, so he is hardly deprived of his opportunity to do so; and (2) as we discuss *infra*, this argument fails on the merits anyway.

The remaining question, then, is whether the Government can properly seek a penalty that is lower than the one assessed by the IRS. Schwarzbaum has identified no authority that requires the Government, in its capacity as a plaintiff in enforcement litigation, to pursue a money judgment for the full amount of an assessed penalty, and we are aware of none. To the same extent, however, the Government identifies no authority which permits it to forgo part of a correctly determined penalty in the interest of litigation

expediency. However, this proposition is analogous to the rule that a private plaintiff may always seek less in money judgment than he may otherwise be entitled to, particularly as a litigation strategy decision. *See, e.g.*, *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994) ("[P]laintiff is . . . the master of his own claim."); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 294 (1938) (holding that the plaintiff "may resort to the expedient of suing for less than the jurisdictional amount . . . though he would be justly entitled to more").

Because there is no dispute that the recalculated penalty by the IRS was done correctly, there is no prejudice to Schwarzbaum, and there is no reason the Government cannot seek a money judgment for an amount less than the full penalty it is entitled to, the district court did not err by entering a judgment enforcing a penalty amount identical to that of the judgment prior to remand.

## B.

Schwarzbaum also claims that the district court's judgment violates the FBAR statute of limitations. Schwarzbaum says that when this case was remanded to the IRS for recalculation of the penalties following *Schwarzbaum I*, the original assessments -- which included the erroneous penalty calculations -- were necessarily vacated because the assessment cannot exist without an underlying calculation. Schwarzbaum reasons that any recalculation by the IRS therefore must have been a new assessment made outside of the six-year statute of limitations. But our Court explicitly decided this issue in the Government's favor in *Schwarzbaum I*, 24

F.4th at 1367, and Schwarzbaum is barred from relitigating the argument.

"Under the 'law of the case' doctrine, the findings of fact and conclusions of law by an appellate court are generally binding in all subsequent proceedings in the same case in the trial court or on a later appeal." *This That & the Other Gift & Tobacco, Inc. v. Cobb County*, 439 F.3d 1275, 1283 (11th Cir. 2006) (quoting *Heathcoat v. Potts*, 905 F.2d 367, 370 (11th Cir. 1990)). The doctrine not only precludes subsequent appellate courts from revisiting issues that were explicitly decided in a prior appeal, but also all matters decided "by necessary implication." *Id.* The law of the case doctrine can be overcome if, but only if: "(1) since the prior decision, 'new and substantially different evidence is produced, or there has been a change in the controlling authority'; or (2) 'the prior decision was clearly erroneous and would result in a manifest injustice.'" *Id.* (quoting *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1288 (11th Cir. 2000)).

In this case, a panel of our Court has already addressed the statute of limitations argument that Schwarzbaum now seeks to relitigate. Before the Court in *Schwarzbaum I*, "Schwarzbaum argue[d] that remand to the IRS [was] unnecessary -- and that [the Eleventh Circuit] should instead direct a judgment in his favor -- because the IRS would be time-barred on remand from recalculating his FBAR penalties." *Schwarzbaum I*, 24 F.4th at 1367. But the panel rejected this argument, stating that Schwarzbaum "cites no authority standing for the proposition that, on remand from

judicial review under the APA, an agency could be time-barred from re-evaluating its original actions," and added that "[w]e are aware of none." *Id.* The panel emphasized that the remand would not raise a statute of limitations issue because "[t]he remand we now direct is not for the IRS to issue new penalties, but for it to recalculate the penalties it has already assessed." *Id.* The Eleventh Circuit directly decided the statute of limitations arguments that Schwarzbaum raises again, and the law of the case doctrine applies. There has been no change in the controlling authority, no substantially different evidence has been produced, and there's no indication that the prior decision was clearly erroneous and that it would result in a manifest injustice.

In short, Schwarzbaum is barred from making his statute of limitations argument anew by the law of the case doctrine.

## C.

Finally, Schwarzbaum claims that "once [the Eleventh Circuit's] mandate issued instructing the district court to remand the matter to the IRS, the district court's work was done and the district court should have closed this case." Schwarzbaum is incorrect; the district court's order retaining jurisdiction over the case following remand was altogether consistent with Eleventh Circuit precedent.

In *Taylor v. Heckler*, 778 F.2d 674 (11th Cir. 1985), the appellant sought district court review of a decision of the Secretary of Health and Human Services denying him certain benefits. *Id.* at 675. The district court concluded that the Secretary's decision was

not adequately supported and remanded the case to the Secretary for further proceedings. *Id.* The Secretary then awarded benefits and the district court later dismissed the case. *Id.* Addressing the question of when a final judgment, if any, had been entered, this Court wrote that "[t]his circuit treats *all* remand orders to the Secretary [of Health and Human Services] as interlocutory orders, not as final judgments." *Id.* at 677 (emphasis in original). The *Taylor* Court further elaborated: "Because this circuit considers a remand order an interlocutory order, it follows by operation of law that the district court retains jurisdiction of the case until the proceedings on remand have been concluded. To terminate its jurisdiction, the district court must subsequently enter a dispositive order of some sort . . . ." *Id.* at 677 n.2.

Although the *Taylor* Court was writing about the power of the Secretary of Health and Human Services, we have applied the same logic to the Federal Highway Administration in *Druid Hills Civic Ass'n v. Federal Highway Administration*, 833 F.2d 1545 (11th Cir. 1987). In the first of two appeals, this Court remanded a case involving the environmental impact of a highway project to the district court for further remand to the Secretary of Transportation to make adequate findings. *Id.* at 1547. Following remand, the Federal Highway Administration made additional findings and the case returned to the district court, which entered summary judgment based upon a record developed entirely on remand which "did not include any part of the record developed in the original administrative proceedings." *Id.* at 1548. Before this Court a second time, the appellant argued that the district court lacked

jurisdiction to entertain the motion for summary judgment be-
cause the district court's judgment adopting the Eleventh Circuit's
remand order constituted a final judgment that terminated litiga-
tion. *Id.* Upholding the district court's exercise of jurisdiction,
however, this Court wrote that "[t]he only distinction between
*Taylor* and this case is that the district court remanded the case to
the Secretary of Transportation because the Eleventh Circuit or-
dered it to do so. This is a distinction without a difference. Hence,
the district court retained jurisdiction." *Id.* at 1549. The *Druid Hills*
Court also observed that when "the purpose of a remand order is
to continue litigation rather than terminate it, such orders cannot
reasonably be construed as terminating litigation on the issues re-
manded." *Id.*

    Our matter is analogous to *Druid Hills*. In both cases, a panel
of this Court remanded the case to the district court for further re-
mand to the administrative agency -- in the case of *Druid Hills*, to
make additional findings, and here, to recalculate the penalty. In
this case, the IRS recalculated the penalty and returned the correct
penalty calculation to the district court. Just like in *Druid Hills*, this
Court's remand to the agency was not intended to terminate litiga-
tion, but to further it. Indeed, the rejection of Schwarzbaum's ar-
gument on the futility of remand makes no sense unless the panel
presumed that further litigation would occur after the recalculation
of the assessed penalty. *See Schwarzbaum I*, 24 F.4th at 1367.

    The district court did not err by retaining jurisdiction.

We therefore **AFFIRM** in part and **REVERSE** in part, and **REMAND** with instructions to enter a judgment in the amount of $12,255,813, and to calculate the amount of late fees and interest.

**AFFIRMED IN PART, REVERSED IN PART, AND RE-MANDED.**